Gamma Law, P.C.
Duy Thai, SBN 157345
Email: dthai@gammalaw.com
Marco Martemucci, SBN 287397
Email: mmartemucci@gammalaw.com
One Sansome Street, Suite 3500
San Francisco, California 94104
Tel.: 415.296.9927
Fax: 415.901.0512

Attorneys for Applicant
Cover Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Ex Parte* Application of<br><br>Cover Corporation,<br><br>       Applicant. | Case No.:<br><br>**DECLARATION OF KEISUKE TANAKA IN SUPPORT OF APPLICANT'S *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN FOREIGN PROCEEDINGS** |

Declaration of Keisuke Tanaka

I, Keisuke Tanaka, declare as follows:

1.    I am a Japan-qualified attorney (*bengoshi* in Japanese), registered to practice law in Japan, and I am an attorney at Leon Law, postal code 103-0004, Frontier Higashi Nihonbashi 3F, Higashi Nihonbashi 2-7-1, Chuo-Ku, Tokyo, Japan. In Japan, I represent applicant Cover Corporation ("Cover Corp." or "Applicant"), a Japanese corporation representing virtual performers on YouTube.

2.    I have personal knowledge of the facts set forth in this declaration ("Declaration") and, if called as a witness, could and would testify competently to such facts under oath.

3.    In preparing this Declaration, I have reviewed the evidence that is being submitted concurrently herewith, and my opinion below is based upon those documents or facts that I have been made aware of.

4.    I submit this Declaration in support of the Ex Parte Application by Applicant for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in Foreign Proceedings (hereinafter "Application"). The Application is for an Order authorizing a subpoena to Google, LLC ("Google"), the company responsible for the "gmail" email service for which an account has been identified as belonging to an anonymous person(s) ("Anonymous Individual") who has made statements online that are subject to civil enforcement in Japanese courts for infringing Applicant's rights.

5.    I was consulted by and advised Applicant about: (a) filing civil lawsuits in Japan against the Anonymous Individual who intentionally infringed upon Applicant's business rights; and (b) discovering the true identity of the Anonymous Individual in order to be able to file those civil lawsuits.

6.    I worked with Applicant and counsel in the United States to identify the account behind the offending message, which was originally posted on X, the social media platform formerly known as Twitter and owned by X Corp. Applicant and others filed a request for an order to disclose information about the anonymous poster

2

Declaration of Keisuke Tanaka

against X Corp. with the Tokyo District Court. The Tokyo District Court accepted the Applicant's request and ordered X Corp. to disclose the information it holds. In response to that order, X Corp. disclosed the anonymous defendant's email address (a gmail address, "ryuryu44334@gmail.com"). Due to the legal system in Japan, it is not possible to proceed with any further identification procedures there.

7.    I am informed and believe that Gmail is owned and operated by Google LLC. Based upon business search results on the California Secretary of State's website, the principal office of Google is located at 1600 Amphitheatre Parkway, Mountain View, CA 94043; attached as **Exhibit 1** is a true and correct copy of a screenshot of the first page of the online business search results.

8.    The Applicant has informed me that they would like to and intend to file civil lawsuits in Japan against the Anonymous Individual, once they are identified, seeking damages under tort law (Civil Code Articles 709) based upon the Anonymous Individual's activity which infringes upon their business rights under Japanese law.

**Background**

9.    Applicant is an agency representing "Virtual YouTubers," commonly known as "VTubers," who use avatars of fictional characters and post videos on YouTube. VTubers use their 2D or 3D avatars similar to costumes or icons, and their activities leverage motion capture technology to reflect the Vtuber's facial expressions and movements in real-time onto the character. Additionally, the voice used during streams is the VTuber's own voice.

10.    The intellectual property rights, including copyrights and publicity rights with regards to the name and design of the 3D character displayed as a VTuber, belong to Applicant. Applicant manages and oversees the videos posted by its VTubers and their communications on social media, directing and supervising all activities related to the VTubers. The management rights of the YouTube channel in question and the copyrights of the videos also belong to Applicant.

3

Declaration of Keisuke Tanaka

11.     The VTuber at issue in this case is an individual who performs under the name "Shirakami Fubuki" (the "Talent") and is a member of the VTuber idol group "Hololive Production" managed by the Applicant. The Talent mainly performs on the video sharing website "YouTube," and posts videos on a channel called "Fubuki Ch. Shirakami Fubuki."

12.     The subject of Applicant's Japanese legal claims is an online post/comment on a YouTube video. The video shows the Talent and other VTubers addressing a controversy involving "Yozora Mel," a first-generation member of Hololive Production ("Hololive First Generation"). As detailed below, the post exceeds the bounds of a mere critical comment and infringes upon the Applicant's business rights in ways that are actionable under Japanese law.

13.     On January 16, 2024, Applicant issued a statement titled "Notice Regarding the Contract Termination of 'Yozora Mel'" (the "Statement"). The Statement claimed that "Yozora Mel," a VTuber belonging to Hololive First Generation, had her contract terminated due to a violation of terms with the agency.

14.     In response to the controversy, the Talent, along with other members of Hololive First Generation excluding "Yozora Mel," conducted a video stream titled "A Message from Hololive First Generation to Our Fans" on their YouTube channel. The main content of this stream included the importance of "Yozora Mel" as a cherished colleague who had worked closely with them, their thoughts on the controversy, and their intentions regarding future activities.

15.     Typically, VTuber businesses generate revenue through advertising income from streams and the super chat feature (where viewers can pay to send comments, often referred to as "donations"). However, this stream did not utilize either of these methods and was conducted without monetization. Normally, super chat contributions are displayed in the comments section of the stream, and the absence of such indicators in this instance clearly showed that the stream was not monetized.

4

Declaration of Keisuke Tanaka

16.    Additionally, the Applicant earns revenue not only from video streaming income but also through a "Membership" system linked to YouTube, which is a monthly fee-based creator support system. The green "Join Membership" notifications occasionally displayed in the comments section during this stream indicate those who joined the membership during the stream, but do not represent revenue generated from the stream itself. Ads may still appear in streams even when the streaming is not monetized, due to YouTube's specifications; the presence of ads does not necessarily mean that monetization is occurring.

17.    On or about January 16, 2024, an individual on the social media platform X (formerly, Twitter) under the account name "@arareGZlq" posted a comment which read (translated from the original Japanese), "What a wonderful stream to casually mourn a contract violator. Cry appropriately and appeal for sympathy, and make money while you're at it" (the "Post").

18.    A true and correct copy of a screenshot of the January 16, 2024 post (originally found at https://twitter.com/arareGZlq/status/1747164207437746268) on X by "@arareGZlq", along with an English translation of the post, is attached hereto as **Exhibit 2.**

**<u>The Infringement of Applicant's Rights under Japanese Law</u>**

19.    The Post includes the term "contract violator," a reference to "Yozora Mel," whose contract was terminated due to a violation of terms with the Applicant. It also includes the term "mourn," which means to grieve for the deceased. Because the Post quotes the Talent's video stream, the Post implies that the Talent is grieving for the contract termination of "Yozora Mel."

20.    The Post also states, "cry appropriately and appeal for sympathy." As used here, the term "appeal" means "to call out to public opinion," but it can also carry a negative connotation, suggesting self-promotion or a façade that hides one's true intentions.

5

Declaration of Keisuke Tanaka

21. The phrase in the Post, "What a wonderful stream …to make money while you're at it," uses the word "wonderful," which is typically positive, but is clearly presented in a context that suggests a paradoxical irony or sarcasm.

22. When considered as a whole, the wording of the Post indicates that the Talent is not actually grieving for the termination of the contract for "Yozora Mel," and is feigning sorrow and tears, thus deceiving the viewers, to earn revenue.

23. The Post significantly tarnishes the image of the Talent and undermines the commercial value of the Talent held by Applicant, resulting in financial damage to Applicant. As such, the Post infringes upon Applicant's business rights under Japanese law.

24. Article 709 of the Civil Code (Compensation for Damages in Tort) provides: "[a] person that has intentionally or negligently infringed the rights or legally protected interests of another person is liable to compensate for damage resulting in consequence."

25. The actions of the Anonymous Individual, in making that posting the offending comment, fall under the category of intentionally infringing upon the Applicant's business rights.

26. Based upon my experience as a lawyer qualified to practice law in Japan, the Applicant will be able to make out a prima facie civil case against the Anonymous Individual because the conduct of the Anonymous Individual infringed upon Applicant's rights in the Talent's value, thus entitling Applicant to recover damages under Article 709, and therefore, the civil lawsuit that will be filed upon discovering the true identity of the Anonymous Individual will withstand a motion to dismiss in a civil court of Japan.

27. No statute of limitation or other limitation in time to commence an action will prevent the Applicant from filing the civil lawsuit against the Anonymous Individual.

6

Declaration of Keisuke Tanaka

28.    However, in order to file a civil lawsuit in Japan, the true identity of a defendant is necessary, because Japanese law does not allow for lawsuits to be filed against anonymous persons. As such, the Applicant is unable to file the civil lawsuits pursuant to Article 709 because the true identity of the Anonymous Individual is unknown.

**Applicant's Request**

29.    Applicant is therefore seeking personal identifying information (hereinafter "PII") for the Anonymous Individual through the discovery sought by the Application in order to identify the true identity of the Anonymous Individual to file the civil lawsuits against the Anonymous Individual.

30.    Google is not, and will not be, a party or participant to the anticipated civil lawsuits in Japan described above, and I am informed and believe that the information or documents sought through discovery are held by them in the United States, and therefore, the information or documents sought through discovery are outside the reach of a court of Japan's jurisdiction.

31.    Based upon my experience as a lawyer qualified to practice law in Japan, I am not aware of any restrictions imposed by or any policies under the laws of Japan limiting U.S. federal court judicial assistance for the purposes herein and in the Application.

32.    Based upon my experience as a lawyer qualified to practice law in Japan, courts of Japan are receptive to assistance in discovery by U.S. federal courts, including for discovery of PII of individuals publishing anonymously online.

33.    The Applicant is not attempting to circumvent any foreign proof-gathering restrictions or other policies of Japan or the United States.

34.    Applicant seeks the PII (names, addresses, email addresses, telephone numbers, and payment information, but not credit card numbers, expiration dates, or validation codes) ever registered with the subject account. This is necessary,

7

Declaration of Keisuke Tanaka

because based upon my experience as a lawyer qualified to practice law in Japan, an Anonymous Individual may have not planned to engage in unlawful activity against Applicant until a time close to when the Anonymous Individual engaged in the events at issue, and as such, it is quite possible that the Anonymous Individual may have used their true identity until a time close to when the Anonymous Individual engaged in the unlawful activity. Additionally, recent PII is also relevant and necessary, because the Anonymous Individual may have not changed PII that is not displayed publicly.

35.    Based upon my experience, where an online account is used for a legitimate purpose, PII is only changed occasionally, and because this information is stored by Google in the ordinary course of its business, the burden placed upon them in disclosing this information is minimal.

36.    The discovery of PII requested is not unduly intrusive, because the request is narrowly tailored to discover the true identity of the Anonymous Individual and is not seeking other information.

37.    Additionally, Applicant seeks to obtain recent access logs for the Gmail account of the Anonymous Individual. I am informed and believe that the following is the reason why access logs (dates, times, IP addresses, and port numbers) of those Accounts (hereinafter the "Recent Access Log") is necessary, in addition to the PII, to identify the Anonymous Individual:

 a. In many cases, an Online Service Provider does not have accurate PII that is sufficient to identify the true identity of the tortfeasor because the Online Service Provider does not always require a user to record his or her true name, address, e-mail address, telephone number, or any other PII.

 b. Where the tortfeasor created an account to engage in unlawful activities, because the PII disclosure is voluntary and by the tortfeasor,

8

Declaration of Keisuke Tanaka

most of the information obtained about the email account may be fictitious.

c. As described below, an alternate path to identifying anonymous users is with a Remote Access Log.

d. When the tortfeasor, the Anonymous Individual in this case, accesses the internet to access their email, the tortfeasor's electronic device (e.g., their laptop or smartphone) initially communicates with an Internet Service Provider ("ISP"). ISPs are the entities that provide internet access services to users. Examples of ISPs in the United States are AT&T and Verizon.

e. Subsequently, the ISP communicates with the company providing online services (hereinafter the "Online Service Provider"), and the tortfeasor is thereby able to access their email account.

f. In each communication, information such as an IP address, a port number, and a time stamp (the time when the specific communication occurred), may have been recorded, which records are commonly known as an "access log."

g. The ISP assigns an IP address and a port number to the user when providing the user with internet access. An ISP is able to identify the user using the information in an access log because it has a record of to whom it assigned a certain IP address and port number at a certain time.

h. ISPs may assign a different IP address and port number every time that a user accesses the internet, and therefore, the time and date that a person was accessing the internet using the specific IP address and port number is necessary.

9

Declaration of Keisuke Tanaka

i.  In layman terms, an IP address is the street address of the user, while the port number is the room number.

j.  Initially, a victim of an unlawful act on the internet, such as the Applicant, does not know the ISP of the user/tortfeasor, and therefore, the victim needs for the Online Service Provider to disclose the access log in its possession.

k.  By obtaining the IP address from the Online Service Provider, the victim is then able to identify the ISP used by the tortfeasor, because the IP addresses owned by an ISP are publicly available information.

l.  The victim can then provide the access log from the Online Service Provider (the IP address, the port number, and timestamp) to the ISP, and request identifying information such as the name and address of the tortfeasor from the ISP tortfeasor in order to file a civil lawsuit against the tortfeasor.

m.  In order for the Applicant to identify the Anonymous Individual through an ISP, both the IP address and a corresponding port number and timestamp is necessary.

n.  Without a corresponding timestamp, a court of Japan will not order an ISP in Japan to disclose information, and an ISP in Japan will be unable to pin-point the tortfeasor that was using the IP address at a certain point-in-time.

o.  Additionally, where the port number is not disclosed, certain ISPs will be unable to pin-point the tortfeasor that was using the IP address even with a timestamp.

p.  The port number is only used in conjunction with an IP address to identify the ISP of the tortfeasor and is used by an ISP to pin-point who was using a certain IP address and a certain port number on a

10

Declaration of Keisuke Tanaka

specific date and time, and therefore, a port number does not intrude upon a person's privacy.

q. The timestamp only shows when a person accessed their online account using a specific IP address and port number, does not disclose what the person was doing using their online account, and therefore, discovery of a timestamp only minimally intrudes upon a person's privacy, and the evidentiary value of a timestamp in allowing the victim to identify the tortfeasor far outweighs any privacy issues.

r. The destination IP address is the IP address of a website. Because of the enormous volume of traffic that certain websites receive, some websites are maintained on several IP addresses. Some ISPs in Japan state that they cannot pinpoint the tortfeasor without the destination IP address (in addition to the IP address, port number, and timestamp), and therefore, if the Online Service Provider maintains the destination IP address, this may be critical in identifying the tortfeasor.

s. Since the destination IP address is simply the IP address of a website such as Instagram, disclosure of this information by the Online Service Provider does not intrude upon a person's privacy.

t. If an Online Service Provider keeps a complete access log indefinitely, a victim can more readily identify the tortfeasor. However, in practice, sufficient access log is not available because (i) the Online Service Provider does not record a complete access log for all communications, (ii) the Online Service Provider only keeps the access log for a short period of time (usually for three to six months); and (iii) a tortfeasor can use special anonymization computer programs to prevent the victim from identifying the tortfeasor through the use of the access log.

11

Declaration of Keisuke Tanaka

u.  Because the access logs are often deleted by Online Service Providers after several months, a recent access log is critical.

v.  While a tortfeasor may be accessing the internet and the Online Service Provider using an anonymization computer program at times, they may have the program off at other times.

w.  For the foregoing reasons, a recent access log for a reasonable period of time is necessary because (i) the Online Service Provider may have not recorded a complete access log if discovery is limited to a short period of time, (ii) older access logs have likely been deleted, and (iii) there is a possibility that the tortfeasor may have had his or her anonymization computer program turned off.

x.  If discovery is allowed only for a short period of time, and/or only for older access logs, it would be less likely that the victim will be able to obtain information sufficient to identify the true identity of the tortfeasor.

y.  Therefore, for the foregoing reasons, it is reasonable to allow discovery of recent access log, and to not limit discovery to the period at or about the time that the unlawful statement was published.

38.  Based upon the foregoing, the information and documents sought are highly relevant and crucial to the Applicant's anticipated civil lawsuits in Japan, and the requests for documents in the proposed subpoenas are narrowly tailored and limited to the discovery of information necessary to identify the true identity of the Anonymous Individual against whom the civil lawsuits will be filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed on April 30, 2025.

*Keisuke Tanaka*

Keisuke Tanaka

12

Declaration of Keisuke Tanaka